UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 09-11245-GAO

SUSAN SMITH HAGER, on behalf of herself and all others similarly situated,
Plaintiff,

v.

VERTRUE, INCORPORATED and ADAPTIVE MARKETING, LLC,
Defendants.

OPINION AND ORDER
September 28, 2011

O'TOOLE, D.J.

The plaintiff, Susan Smith Hager, brings this complaint on behalf of herself and all others similarly situated, alleging that she was deceived into enrolling in certain membership programs marketed online by the defendants Vertrue, Incorporated and Adaptive Marketing, LLC (hereinafter together referred to in the singular as "Adaptive"). She brings claims under Massachusetts General Laws chapter 93A and under a theory of unjust enrichment.

At the initial scheduling conference, the Court determined that discovery should be phased, with the first phase focused on the plaintiff's individual claims, rather than issues related to any putative class of plaintiffs. Adaptive predicted that it would be able to defeat the plaintiff's personal claims on a motion for summary judgment after the completion of the first phase of discovery. Events followed that course, and Adaptive has filed a motion for summary judgment, arguing it is entitled to judgment as a matter of law on the plaintiff's two claims.

**I.**      **Some Preliminary Matters**

Before turning to the merits of the summary judgment argument, there are some motions that need to be addressed.

Adaptive has moved to strike the expert report of Robert Meyer, relied on by the plaintiff. (dkt. no. 39.) After consideration of the parties' submissions on the issue, that motion is GRANTED, substantially for the reasons argued by Adaptive. In brief, Meyer's opinions are not based reliably on sufficient facts and data and the result of a methodology that has been tested and validated by neutral standards. It is in effect an "I know it when I see it" opinion, the sort of *ipse dixit* the Supreme Court has said is inadmissible under Federal Rule of Evidence 702. See General Electric Co. v. Joiner, 522 U.S. 136, 146 (1997). Moreover, as a separate reason, the opinion is not relevant to the question presented by the motion, which is whether Hager, not some unidentified consumer, has a viable cause of action against Adaptive.

The plaintiff's motion to file an opposition with excess pages (dkt. no. 68) is GRANTED, nunc pro tunc. The plaintiff's motion for leave to file newly discovered evidence (dkt. no. 73) is DENIED.

**II.**     **Undisputed Facts**

The record establishes that the following facts are not subject to genuine dispute:

A.      Privacy Matters 1-2-3 and Your Savings Club

In May 2008, Hager, a research analyst with at least a decade of online shopping experience, visited the website free3bureaucreditreport.com, hosted by Magnet Media, to receive credit reports for herself and her husband. The website offered for sale Privacy Matters 1-2-3, a product by Adaptive that provides consumers with credit reports, credit scores, and credit monitoring services.

The initial landing page for free3bureaucreditreport.com described the benefits of Privacy Matters 1-2-3, specifically that one could receive a "three-in-one" credit report from all three credit bureaus. Although Hager knew that there were ways in which she could receive her credit report for free, she wanted to purchase Privacy Matters 1-2-3 because of the "three-in-one" credit report. She clicked on the button, "Get It Now." She admits that she was not deceived into doing so.

The next landing page stated: "Step 1 of 2: When you sign up today for Privacy Matters 1-2-3, you'll also receive Your Savings Club$^{SM}$, a premier shopping and savings program. Save up to 10% - instantly – on gift cards for major stores and restaurants." (Aff. of Stephen May Ex. 2 (dkt. no. 42-2) (hereinafter May Aff.).) On the right side of the page was a box entitled "Offer Details." (Id.) The Offer Details noted that one would immediately be charged a $1.00 refundable processing fee when activating a trial membership to Privacy Matters 1-2-3. It further noted that after a seven-day free trial period, Privacy Matters 1-2-3 would cost $29.95 per month. In a separate paragraph, the box also informed consumers that they would be charged $1.00 per month for a separate membership to Your Savings Club. For both programs, the box contained information about cancelling membership and the timing of charges for the membership fees.

Hager admits she did not read the Offer Details box, but nevertheless entered her name, address, and email address and clicked "Continue." The next page had boxes for credit card information, which Hager entered, and a certification that stated, "By typing my e-mail address below as my electronic signature and clicking 'Submit,' I have read and agree to the Offer Details on the previous page, the Privacy Policy and Terms and Conditions for both Privacy Matters 1-2-3 and Your Savings Club." (May Aff. Ex. 3 (dkt. no. 42-3).) Hager had not read the

Offer Details, nor did she read the Terms and Conditions, but she nevertheless entered her e-mail address and clicked "Submit," enrolling in both programs. (Id.)

    B.    <u>Privacy Matters Identity</u>

The next page thanked her and said that she was "also invited" to become a member of another program by Adaptive, Privacy Matters Identity, an identity-theft protection service. (May Aff. Ex. 4 (dkt. no. 42-4).) The right side of the page again had a box containing Offer Details. The Offer Details noted that a consumer would be charged a $1.00 processing fee, and after a seven-day free trial period, would be charged $29.95 per month for the program. It also contained information about cancelling the program and automatic billing.

On the left side of the page, there were several survey questions. After the questions, the page stated, "[p]lease enter your email address: By typing your e-mail address below, that will constitute your electronic signature and is your written authorization to charge/debit your account according to the Offer Details on this page." (Id.) There was then a box for a consumer to enter his email address, followed by a red button reading "Yes" and a blue button reading "No Thanks." (Id.) Hager entered her email address twice and clicked "Yes," thereby enrolling in Privacy Matters Identity.

Thereafter, a final landing entitled "IMPORTANT INFORMATION" thanked her for enrolling in Privacy Matters 1-2-3, Your Savings Club, and Privacy Matters Identity, provided membership numbers for each program, and advised her that she would shortly receive an email from each program with more information. Adaptive then sent three separate emails to Hager regarding the programs, each of which provided membership identification numbers, each program's website addresses, and hyperlinks to the terms and conditions of the memberships. ([Redacted] Aff. of Eric M. Gold. Exs. 3, 10, 12 (dkt. nos. 41-3, 41-12, 52 at 21) (hereinafter

Gold Aff.).) The emails also included reminders that she could use the benefits during the trial period, could cancel during the trial period, and would automatically be charged monthly after the trial period ended. Hager contends she may not have received at least one of those emails (Your Savings Club), and admits to deleting about ninety percent of her daily emails without reading them.

    C.    At Home Rewards+

After enrolling in the three programs, Hager attempted to enroll in Privacy Matters 1-2-3 a second time because she either had difficulty navigating the website or because she wanted to receive a credit report for herself after receiving one for her husband during the first enrollment. Her enrollment was rejected because she tried to use the same email address and credit card number.

Hager then was presented with a new landing page saying, "We're sorry this offer is no longer available to you," and presenting instead "another great offer," At Home Rewards+, which offers savings on home decorating, improvement, entertainment, shopping, and more. (May Aff. Ex. 6 (dkt. no. 42-6).) On the right side of the page, there again was an "Offer Details" box, which provided essentially the same information as the earlier programs, including a $1.00 processing fee, a seven-day free trial, and a $19.95 monthly membership fee thereafter. (Id.) It also included information about cancelling and about automatic billing. Additionally, it indicated that "by clicking 'Yes' you also agree to activate your separate membership to Your Savings Club at the special low price of just $1.00 per month," and included cancelling and automatic billing information. (Id.)

On the left side of the page, a box stated, "By typing your e-mail address below, it will constitute . . . your electronic signature and is your written authorization to charge/debit your

5

account according to the Offer Details." (Id.) Below that was space for a consumer to enter his email address, a second space to confirm the email address, and two links, one reading "Yes" and one reading "No Thanks." (Id.) Hager entered her email address twice and clicked "Yes," enrolling in At Home Rewards+. (Id.) She was not enrolled in Your Savings Club because she was already a member.

The next page confirmed her enrollment in At Home Rewards+ and provided her with her membership ID number and a link to the program's website. (May Aff. Ex. 7 (dkt. no. 42-7).) She was then sent a confirmation email, which, like the earlier emails, provided her with her membership identification number, the program's website address, and notification that she could use the benefits during the trial period, could cancel during the trial period, and that she would automatically be charged a membership fee after the trial period. (Gold Aff. Ex. 13 (dkt. no. 41-13).)

    D.    SavingsAce

On March 13, 2009, Hager reenrolled as a member of mylife.com, a social networking site that allows members the opportunity to reconnect with old friends. After enrolling, she was presented with a landing page for SavingsAce, an Adaptive consumer savings program. The top of the page said, "Thank you," and "Thank you for your order from MyLife.com today!" (Gold Aff. Ex. 16 (dkt. no. 41-16).) On the right side of the page was a box entitled "Offer Details," which stated that a consumer could click "Yes" to activate a trial membership in SavingsAce and to claim $5.00 cash back. (Id.) It described a seven-day free trial program, after which a consumer would be charged $19.95 per month. Like the other Offer Details boxes, it had information about cancellation and automatic billing.

On the left side of the page, a text box had survey questions and said, "Please complete your Survey below. Click on the answers you want and complete your information to claim your $5.00 Cash Back just for trying SavingsAce, FREE for 7 days." (Id.) The page further requested a consumer to enter an email address, and provided the following warnings: that an email address (1) would constitute an electronic signature; (2) was written authorization to charge or debit an account according to the Offer Details; and (3) would permit mylife.com to securely transfer the consumer's name, address, and credit card information to SavingsAce. It further said, "By clicking 'Yes,' I have read and agree to the Offer Details displayed to the right . . . ." (Id.) The disclosure was followed by two boxes where a consumer could enter his email address and two links, one stating "Yes," and the other stating "No thanks." (Id.)

Without reading a link purportedly containing the terms and conditions, Hager entered her email address twice and clicked "Yes," enrolling in SavingsAce. Soon thereafter, SavingsAce sent an email, which, like the previous emails, contained her membership identification number, the program's website address, and information that she could use the benefits during the trial period, she could cancel during the trial period, and that after the trial, she would be automatically charged the membership fee. (Gold Aff. Ex. 17 (dkt. no. 41-17).)

E.   Credit Card Charges & Cancellation

Beginning in May 2008, Hager was charged monthly membership fees for Privacy Matters 1-2-3, At Home Rewards+, Privacy Matters Identity, and Your Savings Club, and in March 2009, for SavingsAce. The charges appeared as separate line items on her credit card statements with the name of the membership program (or a close indication of the name), her account number, and a toll-free telephone number for each program. Hager generally did not

7

review her credit card statements closely. She noticed the $29.95 charges on the July 2008 bill, but ignored or did not notice the $1.00 charges.

Thereafter, Hager looked more closely at her credit card statements and noticed the telephone numbers, and she and her husband called to cancel each program.

## II.     Discussion

### A.     Factual Disputes Claimed by the Plaintiff

As a threshold matter, Hager contends that there is a factual dispute as to whether she viewed the pages proffered by the defendants. Though not unassailable, the evidence as a whole sufficiently supports the defendants' asserted facts. Adaptive offers as proof, among other things, an affidavit by Stephen May, the president of Magnet Media, as custodian of records. He attests that the landing page is a true and correct copy of a landing page that existed at that time through Adaptive on Magnet Media's website, and that he is informed and believes the pages that follow are true and correct copies of what a consumer would see as the pages progress. Although many paragraphs note that the information is based on May's information and belief, (see, e.g., May Aff. ¶¶ 5-8, 10), the introductory paragraph, (id. ¶ 1), states that the affidavit is submitted based on "[his] personal knowledge and on the business records of Magnet Media, which have been searched under [his] direction." Compare Murphy v. Ford Motor Co., 140 F.R.D. 82, 84-85 (D. Mass. 1997) (citing Sheinkopf v. Stone, 927 F.2d 1259, 1271 (1st Cir. 1991)), with Perez Montero v. CPC Logistics, Inc., 536 F. Supp. 2d 135, 142 (D.P.R. 2008). Adaptive also offers answers to interrogatories with respect to what Hager would have done to enroll in the programs. Additional testimony is offered by Elizabeth Klein about Adaptive's ability to track the pages she viewed by matching the proof of enrollment to the landing page data manager.

In her attempt to show a genuine dispute, Hager generally relies on her deposition testimony, which reveals that she does not really remember the details of the transactions, and the deposition transcript of Nyota Ferguson, where Ferguson states she would have to rely on Magnet Media, the host of the sites, to determine what pages were viewed. The fundamental problem for Hager is that, while she may be able to raise some doubt about whether Adaptive's evidence reliably establishes the content of the pages at issue, she is unable to provide reliable evidence of a version of the content that would support her claims. She seems to forget that she has the burden of establishing the facts sufficient to support her pleaded claims. Consequently, Hager has failed to show a genuine dispute as to a material fact. See Prescott v. Higgins, 538 F.3d 32, 40 (1st Cir. 2008) ("A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party") (internal quotations omitted).

### B.   Chapter 93A Claim

Hager alleges that the defendants violated Chapter 93A, which prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce," Mass. Gen. Laws ch. 93A, § 2(a), through the advertising of their membership programs. Conduct is deceptive when it has "the capacity to mislead consumers, acting reasonably under the circumstances, to act differently from the way they would otherwise have acted (i.e., to entice a reasonable consumer to purchase the product)." Aspinall v. Philip Morris Cos., Inc., 813 N.E. 2d 476, 488 (Mass. 2004). Communication may be deceptive even when it contains accurate information if it, for instance, consists of a "half truth" or if it creates "an overall misleading impression through failure to disclose material information." Id. at 487.

First, what is most telling is that Hager does not contend that she read the relevant information on the landing pages that would have explicitly stated to her that she was enrolling in the new programs. In fact, she readily admits to skipping important information on webpages, skimming her credit card bills, and deleting close to ninety-percent of her daily emails without reading them. Though online consumers may not be expected to read every word during a commercial transaction, "a consumer cannot decline to read clear and easily understandable terms that are provided on the same webpage in close proximity to the location where the consumer indicates his agreement to those terms and then claim that the webpage, which the consumer has failed to read, is deceptive." Bott v. VistaPrint USA, Inc., 392 F. App'x 327, 327-28 (5th Cir. 2010) (quoting In re VistaPrint Corp. Mktg. & Sales Practices Litig., MDL No. 4:08-md-1994, 2009 WL 2884727, at *6 (S.D. Tex. 2009)); see also Baxter v. Intelius, Inc., No. SACV 09-1031 AG (MLGx), 2010 WL 3791487, at *4 (C.D. Cal. Sept. 16, 2010); Pacholec v. Home Depot USA, Inc., No. 06-cv-827, 2007 WL 4893481, at *5 (D.N.J. July 31, 2007).

The problem is one of causation. Having failed to read the materials the defendants provided (even fairly casually), Hager cannot now show the necessary connection between the allegedly deceptive materials and her mistaken enrollment such that the defendants would be responsible for the asserted harm. Holding the defendants liable here would suggest that liability arises simply because Adaptive's landing page follows an originally desired page.

Second, contrary to Hager's allegations, the online marketing of the programs was not deceptive. The transactional experience was sufficient to place reasonable consumers on notice that the webpages at issue were offering new programs and that by entering the requested information and affirmatively clicking "Yes," they were entering into new membership programs. Most significantly, the language on the various landing pages, including the Offer

Details and significance of a consumer typing his email address and clicking "Yes" was "clear and easily understandable by anyone capable of making an online purchase . . . ." See VistaPrint, 2009 WL 2884727, at *6 (finding that Adaptive webpages were "without reservation" not deceptive as a matter of law and dismissing Chapter 93A claim because disclosures were "clear and conspicuous" as described by the FTC's staff guidance on internet advertising disclosures). There is clear language on each landing page advising consumers before they enter their email addresses and click "Yes" that doing so: (1) authorizes the company to charge/debit their accounts according to the Offer Details; (2) indicates that the consumer has read and agrees to the Offer Details; and (3) for SavingsAce, authorizes mylife.com to transfer identification and credit/debit card information to SavingsAce. The language is sufficient to put a reasonable consumer on notice that taking the affirmative steps of entering an email address (twice) and clicking "Yes" would be an acceptance of a new offer. See Baxter, 2010 WL 3791487, at *4.

Moreover, the Offer Details referenced in each box are on the same page immediately adjacent to that box, and likewise state in clear, unambiguous language what Hager would be agreeing to if she were to click "Yes." The Offer Details included explicit information about a finite free trial period, after which her credit card would be charged monthly an enumerated amount of money. There was also information about how to cancel her membership and that if she did not cancel, her credit card would be charged automatically each month.

Sign-up was not a default setting that a consumer had to counteract. Rather, Hager had to take several affirmative steps to become a member of the programs: type her email address and affirmatively press "Yes." She could have, but did not, simply click "No Thanks" right below the "Yes" button. See Berry v. Webloyalty.com, Inc., No. 10-CV-1358-H (CAB), 2011 WL 1375665, at *5 (S.D. Cal. Apr. 11, 2011) (granting motion to dismiss state misrepresentation and

11

unfair competition claims under similar facts); Baxter, 2010 WL 3791487, at *4 (noting that the consumer could not "blindly" accept new offer, and instead had to either accept or decline).

Even further, after the enrollment pages for Privacy Matters 1-2-3, Your Savings Club, Privacy Matters Identity, and At Home Rewards+, a confirmation screen opened thanking her for her enrollment in each program and notifying her that she would be receiving an email with instructions on how to access her benefits. Adaptive also sent Hager separate emails for each program with links to the programs' terms and conditions and reminding her, among other things, about cancellation and that if she did not cancel, she would be charged automatically after the trial period ended, further putting a reasonable consumer on notice of the terms and conditions of the membership. Compare Keithly v. Intelius, Inc., 764 F. Supp. 2d 1257, 1270 (W.D. Wash. 2011) (noting that one could reasonably find that website had capacity to deceive when "[n]one of the normal cues related to a consumer transaction are presented," including among other things, no order summary and no confirmation of the transaction as a consumer would have had to have had the foresight to print the webpage before moving on to know how to contact the company once the subscription fee started being charged to his credit card).

In sum, Hager, in responding to the defendants' motion for summary judgment, has failed to set forth specific facts which would permit a factfinder to conclude that, viewed in the context of the entire experience, the defendants' enrollment process for the contested programs was deceptive and caused her injury.[1] Rather, the enrollment experience as whole was adequate to put a reasonable consumer on notice of a new offer, as well as the basic terms of the offer if accepted. Though not a model of clarity, the relevant disclosures, written in clear language and

---

[1] Because of the lack of causation and because, as Hager argues, the purported deception is based on the context and enrollment experience as a whole, it is unnecessary to reach each individual argument raised by Hager in her opposition to the defendants' motion.

displayed in a manner that was conspicuous to the user, the requirement of affirmative acceptance, the confirmation pages, and the emails containing confirmation and cancelling information are sufficient.

Consequently, the defendants are entitled to judgment as a matter of law as to Hager's Chapter 93A claim..

### C. Unjust Enrichment

Hager's second claim is for unjust enrichment. A claim for unjust enrichment under Massachusetts law requires proof of "unjust enrichment of one party and unjust detriment to the other party." Buskin Assocs., Inc. v. Raytheon Co., 906 F.2d 11, 15 (1st Cir. 1990). In light of the foregoing discussion, Hager has not advanced a theory by which the defendants' acceptance of sales revenue from Hager was done under circumstances making such acceptance unjust.

Moreover, an equitable remedy for unjust enrichment is not available to a party with an adequate remedy at law. E.g., One Wheeler Rd. Assocs. v. Foxboro Co., 843 F. Supp. 792, 799 (D. Mass. 1994); Santagate v. Tower, 833 N.E.2d 171, 176 (Mass. App. Ct. 2005). "Where a contract . . . govern[s] the parties' relationship, the contract provides the measure of the plaintiff's right and no action for unjust enrichment lies." In re Lupron Mktg. & Sales Practices Litig., 295 F. Supp. 2d 148, 182 (D. Mass. 2003). Here, Hager would have an adequate remedy at law if she could prove she was damaged by deceptive acts by Adaptive. The remedy is not available in the circumstances because it lacks provable merit, but that is not an acceptable predicate for an unjust enrichment claim. Accordingly, the defendants are entitled to judgment as a matter of law on her unjust enrichment claim.

**III.**     **Conclusion**

For the foregoing reasons, the defendants' Motion for Summary Judgment (dkt. no. 36) is GRANTED. Since Hager's own claims are unsuccessful, there is no need to consider whether a class should be certified.  Judgment shall enter in favor of the defendants on the complaint.

It is SO ORDERED.

    /s/ George A. O'Toole, Jr.
United States District Judge